1

1         IN THE UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF MISSISSIPPI
2                  NORTHERN DIVISION

3   MICHAEL COREY JENKINS, et al.              PLAINTIFFS

4   VS.                      CAUSE NO. 3:23-cv-374-DPJ-ASH

5   RANKIN COUNTY, MISSISSIPPI, et al.         DEFENDANTS

6

7         ****************************************

8            DEPOSITION OF JEFFERY OZENE GERMANY

9         ****************************************

10

11

12                  Taken at offices of
          Trent Walker, Counselor at Law, PLLC,
13             5255 Keele Street, Suite A,
                   Jackson, Mississippi,
14             on Friday, February 24, 2025,
          beginning at approximately 8:48 a.m.

15

16

17

18

19

20        ****************************************

21              CATHY M. WHITE, CCR
22        Certified Court Reporter #1309
                   Notary Public

23

24

25

2

1                    A P P E A R A N C E S

2

3    TRENT L. WALKER, ESQUIRE
     Trent@Trentwalkerlaw.com
4    Trent L. Walker, Counselor at Law, PLLC
     5255 Keele Street, Suite A
5    Jackson, Mississippi  39206
     601.321.9540
6
              COUNSEL FOR PLAINTIFFS
7

8    JASON E. DARE, ESQUIRE
     jdare@bislawyers.com
9    Biggs, Ingram & Solop
     Post Office Box 14028
10   Jackson, Mississippi  39236-4028
     601.987.5307
11
              COUNSEL FOR DEFENDANTS
12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

INDEX

Style  . . . . . . . . . . . . . . . . . . . .  1

Appearances  . . . . . . . . . . . . . . . . .  2

Index  . . . . . . . . . . . . . . . . . . . .  3

Jeffery Ozene Germany

   BY MR. DARE . . . . . . . . . . . . . . . . .  4

   BY MR. WALKER . . . . . . . . . . . . . . . .  56

   FURTHER BY MR. DARE . . . . . . . . . . . . .  64

Certificate of Court Reporter  . . . . . . . .  67

Certificate of Deponent  . . . . . . . . . . .  68


EXHIBIT INDEX


|         |                                    | MAR |
| ------- | ---------------------------------- | --- |
| Exhibit |                                    |     |
| 1       | Complaint - 3:24-CV-674-KHJ-MTP    | 6   |
| 2       | Call log                           | 14  |
| 3       | Booking sheet                      | 39  |

4

1                    JEFFERY OZENE GERMANY,

2    having been duly sworn, was examined and testified as

3    follows:

4                        EXAMINATION

5    BY MR. DARE:

6        Q.  Can you state your full name for the record,

7    please, sir, including your middle name?

8        A.  Jeffery Ozene Germany.

9        Q.  Spell your first name.  I know Jeffery is

10   spelled different a lot of times.

11       A.  J-E-F-F-E-R-Y.

12       Q.  Mr. Germany, have you ever given a deposition

13   before like we're here on today?

14       A.  I don't think so, no, sir.

15       Q.  The only reason I ask that is because I'm

16   going to walk you through a few ground rules in

17   depositions.  This is my opportunity to talk with you

18   since you're represented by counsel.  As you notice,

19   you were placed under oath and swore to tell the

20   truth, and we've got a court reporter over here taking

21   down everything that I say and everything that you

22   say.  And what's going to come out, it's going to look

23   like a -- it looks like a book.

24           To make sure that the record's clear, though,

25   that's why I have the ground rules.  So wait until I

Jeffery Germany - February 24, 2025

5

1  finish asking the question before you start answering,

2  and I'll wait until after you finish answering before

3  I ask my next question.  That way, it's clear what was

4  asked and what was answered.  Is that all right?

5      A.  Yes, sir.

6      Q.  Folks in Mississippi and the South have a

7  tendency of saying "uh-huh" and "huh-uh" a lot.

8  That's next to impossible to take down on a record.

9  So if you do that, I'm going to ask you to verbalize a

10  "yes" or a "no."  Okay?

11      A.  Yes, sir.

12      Q.  Also, attorneys have a tendency of asking

13  very confusing questions.  We don't do it on purpose.

14  We just -- you know, it sometimes happens.  If ever

15  you don't understand a question, ask me to rephrase

16  it.  But if you answer the question that I ask, I'm

17  going to presume that you understood it and you

18  answered truthfully and honestly.

19      A.  Okay.  Yes, sir.

20      Q.  And this is something that I ask of

21  everybody.  If the answer is "yes," I don't want to

22  know what it is, but have you taken anything today or

23  recently that would impair your ability to either

24  understand my questions or answer truthfully and

25  honestly?

6

1          A.  No, sir.

2          Q.  So we're here today and your deposition was

3   noticed in a case styled Michael Corey Jenkins and

4   Eddie Parker versus Rankin County, Mississippi, et al.

5   It's Cause Number 3:23-cv-374.  But we are actually

6   going to discuss a recent lawsuit that you filed

7   against Rankin County Sheriff's Department, and this

8   is what's filed October 25th, 2024, in Cause Number

9   3:24-cv-674.

10              MR. DARE:  I'm going to have marked as

11         Exhibit 1 to your deposition that Complaint.

12              (Exhibit No. 1 marked.)

13   BY MR. DARE:

14         Q.  Mr. Germany, I've handed you what's been

15   marked as Exhibit 1 to your deposition.

16              MR. DARE:  I have a copy, if you want.

17              MR. WALKER:  No.  I assumed you'd be talking

18         about it.

19   BY MR. DARE:

20         Q.  My first question to you is, have you ever

21   seen this Complaint before today?

22         A.  Yes, sir.

23         Q.  You've had a chance to read over the

24   Complaint before today.  Correct?

25         A.  Yes, sir.

Jeffery Germany - February 24, 2025

7

1      Q.  And is it your testimony here today that all
2    facts and circumstances alleged in the complaint
3    that's marked as Exhibit 1 to your deposition are
4    true, accurate, and correct?  You can --
5           MR. WALKER:  That's what we talked about this
6       morning.
7       A.  Oh, yes, sir.
8    BY MR. DARE:
9       Q.  And if you want to, you can take your time.
10   We can go off the record and you can review that
11   again.
12      A.  Just this, just right here on number 11.
13      Q.  Paragraph 11?
14      A.  Yes.
15      Q.  Okay.
16      A.  When I was arrested, they didn't tase me that
17   time, no, sir, not on this particular...
18          MR. WALKER:  Finish your sentence.
19      A.  Not on this particular arrest.  You know what
20   I'm saying?  That we're talking about right here.
21   They didn't tase me right then, no, sir.  That was
22   something that did not happen right there.
23   BY MR. DARE:
24      Q.  So you were not tased on October 25th, 2021,
25   when you were arrested.  Correct?

Jeffery Germany - February 24, 2025

8

1        A.   No.

2        Q.   Making sure -- that was --

3        A.   That's right.

4        Q.   -- was perhaps a bad question and making sure

5    that my question and your answer are clear, because I

6    ended that with, "Correct."

7             Were you tased at all on October 25, 2021,

8    when you were arrested?

9        A.   No, sir.

10        Q.   So paragraph 11 of this Complaint that's

11    marked as Exhibit 2 to your -- marked as Exhibit 1 to

12    your deposition, that is inaccurate.  Is that right?

13        A.   Yes, sir.

14        Q.   Anything else?

15        A.   That's all I see.

16        Q.   All right.  So flip back to page 1.  And I

17    know this may just be a scrivener's error.  Paragraph

18    1, it says, "For their Complaint, Plaintiffs Raju

19    Jeffery Germany and Natalie Germany."

20             Do you go by Raju?

21             MR. WALKER:  It's a scrivener's error.

22             MR. DARE:  Okay.

23        A.   I don't know what that -- yeah, I don't know

24    what that is.

25    BY MR. DARE:

Jeffery Germany - February 24, 2025

11

1    neither one of your sons live with you?

2         A.   They live with my mother and father.

3         Q.   How long have they lived with your mom and

4    dad?

5         A.   2010, 2008, between 2009, 2010, something

6    like that.

7         Q.   Going back to Exhibit 1 to your deposition,

8    getting on to the facts of the case, it said in

9    paragraph 10, this is page 3, it says that, "On or

10   about October 25, 2021, the Plaintiff, Jeffery

11   Germany, suffered a mental health episode and was

12   threatening to commit suicide.  Plaintiff, Natalie

13   Germany, and other family members called 911 for

14   assistance and deputies from the Rankin County

15   Sheriff's Department responded."

16        First off, did I read that correctly?

17        A.   Yes, sir.

18        Q.   And on October 25, 2021, had you ever

19   threatened to commit suicide?

20        MR. WALKER:  You mean before that day or that

21        day?

22   BY MR. DARE:

23        Q.   At any point in time on that day.

24        A.   Repeat the question again.

25        Q.   Had you actually threatened to commit suicide

1    on October 25 of 2021?

2        A.  Yes, yes, yes.

3        Q.  But you understand and you know that the

4    reason that the deputies were called on that day was

5    because you had an altercation with your wife,

6    Natalie.  Is that right?

7            MR. WALKER:  Object to the form.

8            You can answer if you know.

9        A.  I didn't -- I didn't -- I don't know -- I

10   didn't -- I didn't call the -- I don't know.  You

11   know, I don't know what was -- what was said or what

12   was...

13   BY MR. DARE:

14       Q.  You don't know why the call was made?

15       A.  They was worried about me.  I know that.

16       Q.  Had you taken any illegal drugs or any drugs

17   of any form on October 25, 2021?

18       A.  I had.

19       Q.  What?

20       A.  Meth.

21       Q.  Is that something that you believe that you

22   were addicted to back in October of '21?

23       A.  Yes, sir.  That's part of my life story, yes,

24   sir.

25       Q.  Do you feel like you're still addicted to

13

1   meth even as of today's date?

2       A.  No, not -- I'm not using the drug as of now,

3   but you always got to be observant or you'll be right

4   back where you were.  Does that -- does that make

5   sense?

6       Q.  When was the last time you used meth?

7       A.  I can't tell you the last time.

8       Q.  Within the past three months?

9       A.  No, no.

10      Q.  Within the past year?

11      A.  I can't -- I don't know.  I don't know the

12  last time I've used meth.  I just -- I've tried to

13  move on.  You know what I'm saying?  I'm not the

14  person I was.

15      Q.  You're not the person that you were in

16  October of '21.  Is that right?

17          MR. WALKER:  Object to the form.

18          You can answer.

19      A.  No.

20  BY MR. DARE:

21      Q.  And part of you moving on is not using meth

22  anymore.  Is that right?

23      A.  Yes.

24      Q.  Did you use any other drugs and/or alcohol in

25  October of '21?

Jeffery Germany - February 24, 2025

14

1          A.   Not that I recall.  Meth was -- that was --
2     that was my problem.  You know what I'm saying?  I
3     was looking -- meth was what, you know, I was using,
4     not -- but I could have -- I may have smoked pot, too.
5     You know what I'm saying?
6               MR. DARE:  I'm going to have marked as
7          Exhibit 2 to your deposition a call log from
8          October 25, 2021.
9               (Exhibit No. 2 marked.)
10    BY MR. DARE:
11         Q.   I'm going to hand you what's been marked as
12    Exhibit 2 to your deposition.  You notice at the
13    bottom right-hand corner, it's got numbers on it, and
14    on page 2 of this document, it says 10/25/2021,
15    13:19:25 military time, it says, "Caller advised that
16    a male was trying to murder his wife, just kept saying
17    come on.  Hung up, tried to call back, no answer."
18    First, did I read that correctly?
19         A.   Where?
20         Q.   On page 2.
21         A.   Okay.
22         Q.   The very first entry.
23         A.   Just kept saying come on, hung up, tried to
24    call back, no answer.
25         Q.   Right.  So did I read that correctly?

15

1        A.  Yes, sir.

2        Q.  And do you dispute, as you sit here today,

3   that on October 25, 2021, that you had a shotgun and

4   that you took your wife away from this area armed with

5   a shotgun and by force?

6        A.  Yes.  I did not take nobody by force away

7   from anywhere.

8        Q.  You did not grab your wife by the hair and

9   put her in a vehicle?

10        A.  No, sir, I did not.  I did not.  Me and her,

11   she willingly went with me.

12        Q.  Do you admit that you had a shot1gun on that

13   day?

14        A.  When I was arrested, yes, I had -- I was

15   armed.  I had a shotgun, yes.

16        Q.  And you were a convicted felon at that point

17   in time.  Correct?

18        A.  Yes.  I went to prison for that offense, yes,

19   sir.

20        Q.  And that was going to be my next question,

21   is, it was illegal for you to have that shotgun?

22        A.  I went to prison for possession of a firearm

23   by a convicted felon.

24        Q.  Correct.

25        A.  Yes, sir.

Jeffery Germany - February 24, 2025

16

1           THE WITNESS:  May I speak to you, Mr. Trent?

2           MR. WALKER:  Let's go off the record.

3           MR. DARE:  Before we go off, what I do have

4      to say is that you are under oath.  I did not have

5      a question on the table.  So at any point in time,

6      you can take a break.  However, because you're

7      under oath, you cannot speak with your counsel

8      about the subject of this deposition, as your

9      counsel, I would imagine, would tell you.  So I

10     don't mind the two of y'all talking so long as

11     it's not about the subject of this deposition.

12          MR. WALKER:  To be clear, the subject of the

13     deposition that you're referring to is the lawsuit

14     or the facts and allegations in his complaint?

15          MR. DARE:  I mean, he's currently a witness.

16          MR. WALKER:  Yes.

17          MR. DARE:  And he's under oath, and during

18     the middle of the deposition, he is not allowed to

19     talk with you about the subject of this

20     deposition.

21          THE WITNESS:  Can I end this deposition if I

22     want?

23          MR. WALKER:  No.  We'll talk in a second.

24          THE WITNESS:  All right.

25          MR. DARE:  But, anyway, you understand the

17

1       rules.  I get that.

2           MR. WALKER:  Yes.

3           MR. DARE:  So I just wanted to make sure that

4       that was clear for the record.

5           We can go off the record.

6           (Recess.)

7 BY MR. DARE:

8      Q.  Mr. Germany, I'm going to play for you some

9 dispatch audio of an individual related to the call

10 that the Rankin County Sheriff's Department received

11 on October 25, 2021.

12           MR. DARE:  This is going to be on the record.

13       I can get you a copy.  I was going to give the

14       court reporter the flash drive that has this in

15       case any of it's unclear, but I can get you a copy

16       of this dispatch audio.

17           MR. WALKER:  Thank you.

18           (Recording played as follows:)

19           911 OPERATOR:  This is 911.  What is the

20       address of your emergency?

21           CALLER:  I need somebody at 110 now on

22       Marsman.  He's kidnapping his wife.  He's killing

23       her.  Now.  Now.

24           911 OPERATOR:  What is the address?

25           CALLER:  It's Germany.  It's 110 Marsman.

Jeffery Germany - February 24, 2025

18

1     Come quick.  Come quick.  I said quick.  He's

2     going to kill (indiscernible.)  Quick.  Quick.

3         911 OPERATOR:  All right, ma'am.  You said

4     110 Morrison?

5         CALLER:  Now.  Now.  Now.  Now.

6         911 OPERATOR:  All right.  I'm showing you at

7     Magnolia Road.

8         CALLER:  Come on.  She's -- he's killing her.

9     Come on.

10        911 OPERATOR:  Ma'am, what is your address?

11    Because you're pinging off of (indiscernible)

12    Ridge.

13        CALLER:  He's run off in the ditch.  Come on.

14    Come on.  He's back in the truck.  He's going to

15    kill her.  Come on.  Come on.

16        911 OPERATOR:  Ma'am, what is the address?

17        CALLER:  Come on.  Come on.  Come on.  Hurry.

18        911 OPERATOR:  Ma'am?  Ma'am?

19        (Recording stopped.)

20  BY MR. DARE:

21    Q.  Who was that on that recording?

22    A.  I don't -- I don't know.  It sounds like my

23  grandmother, but I'm -- you know what I'm saying, I'm

24  not -- I didn't make the -- sounds like my

25  grandmother.

Jeffery Germany - February 24, 2025

19

```
 1        Q.   Who's your grandmother?

 2        A.   Mildred Tumblin (phonetic).

 3        Q.   Is your grandmother still living?

 4        A.   Yes, sir.  She's 90-something.

 5        Q.   Where does she live?

 6        A.   110 Marsman Road, Marsman Road.

 7        Q.   In Brandon?

 8        A.   Yes, sir.  110 Marsman Road, Brandon,

 9   Mississippi 39047.

10        Q.   You would agree with me that, according to

11   the information obtained by the Rankin County

12   Sheriff's Department, it wasn't that you were having a

13   mental health episode or that you were threatening

14   suicide, it was that you were threatening to harm your

15   wife.

16             MR. WALKER:  Object to the form.

17             You can answer if you know.

18   BY MR. DARE:

19        Q.   Based on the 911 audio that you just heard.

20        A.   What's the question again now?

21        Q.   Sure.  Would you agree with me that the

22   information conveyed to the Rankin County Sheriff's

23   Department on October 25, 2021, was that you were

24   attempting to harm your wife and not that you were

25   having a mental health episode and/or threatening
```

20

1   suicide?

2        A.   I still don't understand.

3        Q.   Based on the call that you just heard.

4        A.   It may -- the call that -- oh, never mind.

5   Say again.

6        Q.   Based on the call that you just heard, was

7   there any mention of you threatening suicide?

8        A.   Based on the call I just heard, I did not

9   hear that.

10       Q.   You didn't hear any reference to he's about

11  to commit suicide?

12       A.   No.

13       Q.   But you did hear reference to he's trying to

14  kill her.  Right?

15            MR. WALKER:  Same objection.  The audio

16       speaks for itself.

17            You can answer.

18       A.   I heard rambling.

19  BY MR. DARE:

20       Q.   So you didn't quite hear what the audio was

21  saying?

22       A.   It really made no sense.

23       Q.   Did it sound like your grandmother was pretty

24  upset?

25            MR. WALKER:  Object to the form.

21

1              You can answer if you know.

2         A.  I don't -- it sounded that way, yeah.

3    BY MR. DARE:

4         Q.  Going to paragraph 11 of your complaint on

5    Exhibit 1, it says, "Deputies apprehended Jeffery

6    Germany in the woods near the Germany residence.

7    During the apprehension of Jeffery Germany, deputies

8    unnecessarily tased him.  He was then transported to

9    Rankin County Sheriff's Department."

10             You've already testified that paragraph 11 to

11   your complaint is unequivocally false.

12             MR. WALKER:  Object to the form.  What he

13        testified to is that he was not tased.  He did not

14        say that any other part of that paragraph was

15        unequivocally false.

16   BY MR. DARE:

17        Q.  Okay.  You can answer.

18        A.  I was not tased, no, sir.

19        Q.  All right.  Are you saying that, on October

20   25, 2021, while out at the Castlewoods golf course,

21   when you were being arrested, that the deputies hit

22   you, beat you, roughed you up in any way, shape, or

23   form?

24        A.  No, sir, not at the golf course.  This was

25   back at the Sherrif's Department.  Mr. Brett McAlpin,

Jeffery Germany - February 24, 2025

24

1    Q.   I'm getting to that.

2    A.   Yeah.

3    Q.   I'm establishing what went on at the golf

4  course.   Nothing.

5    A.   I was handcuffed and taken to the Sheriff's

6  Department.

7    Q.   In fact, the deputies gave you some water

8  that they got from a neighbor out on the golf course,

9  didn't they?

10    A.   Yes, sir.   Somebody -- I was given a water,

11  yes, sir.

12    Q.   And, in fact, all of the deputies that

13  arrested you, the two deputies that arrested you, were

14  as professional as they could be with you considering

15  that you had a shotgun.   Is that right?

16    A.   The two that arrested me, I have -- one put

17  the hand -- you know, it was two of them when I come

18  out there.   But anyways, it was two of them that --

19  they didn't -- they were straight up guys.   I have

20  nothing bad to say about them, or will I.   You know

21  what I'm saying?   They were -- you know what I'm

22  saying?   I'm grateful they didn't shoot me.   You know

23  what I'm saying?   But I didn't -- you know, I didn't

24  point no gun at them or nothing like that, either.

25    Q.   And as we've established, they didn't shoot

33

1        A.   Like -- like -- when they brought her in

2   there, like, she didn't want no part of that, you

3   know.  Like, she kind of slapped me, and it wasn't --

4   it wasn't up to their standards, you know, and she

5   just had to pretty much watch.  You know what I'm

6   saying?  But...

7        Q.   Did your wife actually hit you at all?

8        A.   Yes.  She slapped me.

9        Q.   And again, where?

10        A.   Like this, you know, just slapped me, like,

11   basically in the ear like.

12        Q.   So your wife slapped you one time in the ear?

13        A.   Man, she wouldn't -- she wasn't waylaying me.

14   You know what I'm saying?  She -- whatever -- they --

15   once or twice, maybe two times.  You know what I'm

16   saying?  She slapped at me and whatever, and it wasn't

17   up to their...

18             MR. WALKER:  Finish your sentence.

19        A.   Wasn't up to their standards, I reckon.

20   BY MR. DARE:

21        Q.   Why do you reckon it wasn't up to their

22   standards?

23        A.   Wasn't tough enough.

24        Q.   The hits weren't hard enough or you weren't

25   tough enough?

38

1    Q.  Did you ever speak with anybody at the

2 Sheriff's Department about this incident?

3    A.  Ronnie Moore.  I talked to Ronnie about it.

4 I talked to Ronnie Moore.  You know what I'm saying?

5 But you know what I'm saying?  He's retired.  You know

6 what I'm saying?  I told -- I drive a roll-back and I

7 towed for him.

8    Q.  And you understood that, when you spoke with

9 Ronnie, he'd already been retired from the Sheriff's

10 Department?

11    A.  Yeah.  Last time I -- yeah.  You know, I was

12 asking him just if it's -- I don't know.  Basically is

13 it worth it, you know.  I'm fearful of even saying any

14 of this.

15    Q.  Who were you represented by in the criminal

16 charges that were against you stemming from this

17 October 25, 2021, incident?

18    A.  Ed Rainer.

19    Q.  And what charges were you either found guilty

20 of and/or pled guilty to as a result of this October

21 25, 2021, incident?

22    A.  Possession of a firearm by a felon.

23    Q.  I would assume that you've seen it, but you

24 would agree with me -- and I can show you your booking

25 photo.  You'd agree with me that your booking photo

39

1   wouldn't show any of the bumps or bruises or what have

2   you that you claim resulted from this beating by Brett

3   and Christian?

4        A.   No.  They're -- the booking photo is just

5   your face.  You know what I'm saying?  No.

6        Q.   You also get the side-view.  Right?

7        A.   Yeah.  But like I said, like, my hair is

8   shorter now.  My hair was long.  My ears were covered.

9        Q.   It was your left ear that you say said was

10  cauliflowered up.  Right?

11       A.   I can't tell you which ear it was, but I just

12  know there was -- they've always -- it was just

13  something he always focused on, man, was my ears.

14       Q.   Should be some bumps or bruises around your

15  left ear, though.  Right?

16            MR. WALKER:  Object to speculation.

17  BY MR. DARE:

18       Q.   If you got hit in your ear?

19            MR. WALKER:  Same objection.

20  BY MR. DARE:

21       Q.   You may answer.

22       A.   I know what my ears felt like afterwards.

23  Okay?  So there's nothing I can...

24            MR. DARE:  This will be Exhibit 3.

25            (Exhibit No. 3 marked.)

Jeffery Germany - February 24, 2025

40

1    BY MR. DARE:

2         Q.  I'm going to hand you what's been marked as

3    Exhibit 3 to your deposition.

4         A.  You can see my ear looks swollen --

5         Q.  I haven't asked a question yet.

6              So now, earlier you testified that your hair

7    was so long it covered your ear.  Right?

8         A.  It --

9         Q.  Hang on.  My question was, earlier you

10   testified that your hair was so long that it covered

11   your ear.  That's not true, is it?

12        A.  It does cover it to an extent.  Yes, sir, it

13   does, in my opinion.  You know, now my ears, even now

14   they're covered.  You know what I'm saying?  I call

15   them my earmuffs.  That's what --

16        Q.  And are you testifying here today that

17   Exhibit 3 shows that you have any damage to your left

18   ear?

19        A.  Looks like it's swole to me, yeah.  My ears

20   are not normally -- it looks swole to me.  Yes, sir,

21   it does.  It looks red, yeah.  And if you've ever been

22   done like that, he hits and he twists.  Man, I'm --

23             MR. WALKER:  Hold on.

24   BY MR. DARE:

25        Q.  Brett was a -- is a pretty big guy.  Right?

Jeffery Germany - February 24, 2025

54

1    haven't.

2        Q.  Do you know, as you sit here today, how the

3    false statement that you were unnecessarily tased on

4    October 25, 2021, made it into this federal pleading?

5            MR. WALKER:  Object to the form.

6    BY MR. DARE:

7        Q.  You can answer.

8            MR. WALKER:  You can answer if you know.

9        A.  I'm assuming it's from me and him talking

10   about it and it was just -- I was tased.  You know,

11   they tased me in 2017 and, you know, when I come here

12   and talked to him about it, that's what I'm thinking.

13   But I don't know.  I didn't -- because I told him

14   about the incident in 2017, and that's -- but I seen

15   that from with the jump when I got here earlier this

16   morning and I tried to...

17           MR. WALKER:  You don't have to tell him what

18       we talked about.

19           THE WITNESS:  Oh, my bad.

20   BY MR. DARE:

21       Q.  Was the first time that you had seen this

22   complaint was today?

23       A.  Me and him -- I've been here before, you

24   know, and --

25       Q.  My question was, the first time that you saw

Jeffery Germany - February 24, 2025

55

1    this complaint that's marked as Exhibit 1 to your

2    deposition, the first time that you saw it was today?

3         A.  Yes, sir.

4         Q.  Okay.  And that paragraph 11 immediately

5    stood out to you?

6              MR. WALKER:  That you had been --

7         A.  Yeah, yeah, yeah.  Yes, sir.  I just know

8    that was...

9              MR. DARE:  Give me about five minutes.  I'm

10        going to look through my notes.  I think we might

11        be done.

12             (Recess.)

13   BY MR. DARE:

14        Q.  Going back to the May 2017 incident, the

15   search warrant for your house, what was that searching

16   for?

17        A.  Smell of marijuana.

18        Q.  So they were searching for drugs?

19        A.  Yes, sir.

20             MR. DARE:  All right.  I tender the witness.

21             THE WITNESS:  What does at that mean?

22             MR. WALKER:  That means he's done asking

23        questions except for in response to the questions

24        I ask.

25             THE WITNESS:  Okay.

67

1              CERTIFICATE OF COURT REPORTER

2              I, Catherine M. White, CSR, and Notary Public

3       in and for the County of Rankin, State of Mississippi,

4       hereby certify that the foregoing pages, and including

5       this page, contain a true and correct transcript of

6       the testimony of the witness, as taken by me at the

7       time and place heretofore stated, and later reduced to

8       typewritten form by computer-aided transcription under

9       my supervision and to the best of my skill and

10      ability.

11             I further certify that I placed the witness

12      under oath to truthfully answer the questions in this

13      matter under the power vested in me by the State of

14      Mississippi.  I further certify that I am not in the

15      employ of or related to any counsel or party in this

16      matter, and have no interest, monetary or otherwise,

17      in the final outcome of the proceedings.

18             Witness my signature and seal this the 9th

19      day of March, 2025.

20      _____

21      CATHERINE M. WHITE, CSR No. 1309

22      My Commission Expires:
        February 1, 2026

23

24

25

## RANKIN COUNTY JAIL

 

### Name
### GERMANY, JEFFERY OZENE

Street   Address:                                           Age: 41
1615 HIGHWAY 471
CITY:        STATE:    ZIP:
BRANDON, MS  390420000

| Arrest Date: | Time: | Arresting Agency: | Court Date: | Arrest Location: | |
|---|---|---|---|---|---|
| 10/25/21 | 18:34 | RSO | | | |
| | Release Date: | 12/14/2021 | | Brandon | MS |

| | | | | | |
|---|---|---|---|---|---|
| Sex:M | Eyes: BRO | Height:  5-11 | Appearance:  20 | | |
| Race:W | Hair: BRO | Weight: 300 | Build:  7 | | |
| Scars/Marks/Tattoos: | | Birth Place:  FLOWOOD | | MS | |

| 1 | 00345 | KIDNAPING: CAPITAL | F | 0.00 |
|---|---|---|---|---|
| | Statute (RSA): 97-3-53 | | | |
| 2 | 00382 | WEAPON, POSSESSION BY CONVICTED FELON | F | 0.00 |
| | Statute (RSA): 97-37-5 | | | |



EXHIBIT
3
Germany